The facts sufficiently appear from the opinion of the Court, which was drawn up by
Rice, J.
These cases come before the Court on full reports of evidence. They all refer'to the same subject matter, and the evidence submitted and the facts, admitted or proved, apply with slight exceptions to all. Though the evidence reported is very voluminous, the facts, on which ■the rights of the parties depend, are neither numerous nor complicated. As a foundation for the application of legal principles pertinent to the issues presented, we state the controlling facts established by the evidence reported. - They are as follows : —
The Penobscot river, at the point thereof where the mills of the parties litigant are located, is a fresh water stream, not affected by the ebb and flow of the tide, but of sufficient capacity in its natural state to float logs, rafts and-lumber;
That the mill site of Yeazie was first occupied as such in-1801, and has been thus occupied from that time to the present ; and the mill site of Dwinel has been occupied as such, from 1803 to the present time;
'That Dwinel’s dams, by which the head of water was raised and has been maintained, consists of a structure across the western branch of the main river and a side dam *481 between Goat Island and Webster Island, through which latter structure there has been. a sluice for the passage of rafts, logs, &c.;
That Dwinel and his predecessors have ever maintained a convenient and suitable passage way for rafts, logs and lumber, from Yeazie’s mills to and through the sluice in the side dam, except when the same has been obstructed by slabs and other waste material thrown into the same by the occupants of Veazie’s mills, and except also a portion of the year 1854, when the "gap” or "breach” in the side dam was permitted to remain unrepaired;
That, the piers placed in the "basin” were constructed with the knowledge and assent of Yeazie; and had a tendency, with the boom attached thereto, to render more safe and convenient the passage for rafts to the sluice, as well as the passage for logs to the mill pond of Dwinel;
That, in 1846, Dwinel reconstructed or rebuilt his dam across the main stream, and increased the efficient height thereof, but not to such an extent as to obstruct the operation of any mills then in existence on the mill site occupied by Yeazie;
That the practice of throwing slabs, edgings and other waste materials into the stream, from mills on the Penobscot river, has prevailed from an early period, and, with few exceptions, prevails at the present day.
These propositions, which wo think are well established by the evidence in the case, cover the main facts in controversy, upon which the rights of the parties depend; and the application of established legal principles will dispose of all the cases before us without detailed examination of each particular case.
First, then, do the dams and mills of either party, exist in violation of law? Or, in other words, do they, or either of them, constitute public or private nuisances ?
A nuisance has been defined as anything that worketh hurt, inconvenience or damage. “ 3 Black. Com., 116.
A public or common nuisance is such an inconvenience, *482 or troublesome'offence, as annoys the whole community in general, and not merely some particular person. 1 Howard, 197; 4 Black. Com., 166, 167.
A private nuisance is anything done to the hurt, or annoyance of the lands, tenements, or hereditaments of another. 3 Black., 215.
All erections and impediments made by the owners of adjacent lands to the free use of rivers, which are navigable for boats and rafts, are deemed nuisances. 3 Kent’s Com., 411.
These are general principles, and do not, of course apply to obstructions or other inconveniences which are authorized by law. Such are not nuisances. Trustees v. Utica, 6 Barb., 313. The subject will be further examined in another part of the case.
To encourage the erection and maintenance of water mills, has long been the established policy of this State, and of Massachusetts before our separation. Our mill Act, as it is termed, had its origin in the latter State, in the early part of the last century, and has been continued, with slight modifications, both in Massachusetts and this State, to the present time. The object of the statute was thus stated in the preamble to this law, at its origin :—
' "Whereas, it has been found, by experience, that when some persons in this province have been at great cost and expenses for building of mills serviceable for the public good and benefit of the town, or considerable neighborhood in. or near to which they have been erected, that in raising a suitable head of water for that service, it hath sometimes so happened that some small quantity of lands or meadows have been thereby flowed and damnified, not belonging to the.owner or owners of such mill or mills, whereby several controversies and lawsuits have arisen, for the prevention. whereof for the future. Be it therefore enacted,” &c. Ancient Charters, p. 404.
In 1796, February 27, the legislature of Massachusetts *483 passed an additional or amendatory Act, the preamble and first section of which are as follows : —
"Whereas, the erection and support of mills to accommodate the inhabitants of the several parts of the State ought not to be discouraged by many doubts and disputes; and some special provisions are found necessary relative to the flowing of adjacent lands, and mills held by several proprietors. Therefore, Be it enacted,” &c.
"That when any person hath already erected, or shall erect any water mill on his own land or on the land of any other person, by his consent legally obtained, and to the working of such mills it shall bo found necessary to raise a suitable head of water; and in so doing any lands shall be flowed not belonging to the owner of such mill, it shall be lawful for the owner or occupant of such mill to continue the same head of water on the terms hereinafter mentioned.”
This provision was incorporated into our statutes in 1821. Smith’s Laws, vol. 1, c. 45; and was in force when the dams on both mill sites now occupied by the parties were originally erected.
It will be perceived that the Act is, in its terms, very broad, and applies to all cases, whether the streams were navigable or otherwise.
By the Act of 1840, c. 126, § 1, B. S,, it is provided that any man may erect and maintain a watei mill, and dam to raise water for working it, upon and across 'any stream that is not navigable, upon the terms and conditions and subject to the regulations hereinafter expressed! -'
The facts show that D wind’s dam has been raised since 1840, and it is contended that this has been' done without authority, because the river at that point ,is a navigable stream.
This raises the distinct question, what is a navigable stream, within the meaning of the statute of 1840? .
There is a distinction at common law between navigable rivers, technically so called, and rivers which’ have the capacity to float boats, rafts and logs, and subjected to *484 servitude of the public, and which are therefore denominated public highways.
All rivers where the tide ebbs and flows are, by the common law, denominated navigable rivers. Com. Dig. Navigation B, and prerogative D, 50; 3 Kent’s Com., 412; Ward v. Creswell, 3 Wills, 265; Scott v. Wilson, 3 N. H. 321.
A river is deemed navigable in the technical sense of the term as high from the mouth as the tide ebbs and flows. Ang. on Watei’courses, 205 ; Berry v. Carl, 3 Maine, 269 ; Com. v. Chapin, 5 Pick., 199 ; Spring v. Russell, 7 Maine, 273; Brown v. Chadbourn, 31 Maine, 9; Knox v. Chaloner, 42 Maine, 150; Strout v. Millbridge Co., 45 Maine, 76 ; Palmer v. Mulligan, 3 Caine’s R., 307.
Lord Hale, in his De Jure Maris, c. 3, says, — "There be some streams or rivers that are private not only in propriety or ownership, but in use, as little streams and rivers that are not of common passage for the king’s people. Again, there be other rivers, as well fresh as salt, that are of common or public use for the carriage of boats and lighters, and these, whether fresh or salt, whether they flow and reflow or not, are prima facie, publici juris, common highways for man or goods, or both, from one inland town to another.” And he instances the Wey, the Severn, and the Thames, as rivers of that description.
All streams in this State of sufficient capacity, in their natural condition, to float boats, rafts or logs, are deemed public highways, and as such, subject to the use of the public. Wadsworth v. Smith, 2 Fairf., 278; Berry v. Carl, 3 Maine, 269; Spring v. Russell, 7 Maine, 273 ; Brown v. Chadbourn, 31 Maine, 9 ; Knox v. Chaloner, 42 Maine, 150.
In Brown v. Chadbourn, Wells, J., remarks, in giving the opinion of the Court; "In this State, the rights of public use have never been carried so far as to place fresh water streams on the same ground as those in which the tide ebbs and flows, and which alone are considered strictly navigable at common law.”
*485 Iii Spring v. Russell, Mellen, C. J., remarked, — "'Sae© river, in the town of Fryeburg, is one of the character above described; not a navigable river, however deep and large, in common law language, being above tide waters, but is under servitude to the public interests, and over the waters of which the public have a right to pass. In this respect such a river resembles a highway on land.”
•Though in many of the States of the Union, which are intersected or bounded by the great rivers of the continent, the common law distinction between navigable rivers, and those which are simply recognized as highways, does not exist; in this State, as has been seen, the common law definition has been fully recognized.
Under our existing mill Act this distinction becomes of paramount importance, for were all our streams, which are capable of floating rafts or logs, to be deemed navigable within the meaning of the statute, it would at once place out of the protection of the law all the mills and dams now existing on the floatable streams in the State. The Act contemplates no such destructive operation, and cannot receive such construction. The dams of both parties are, therefore, and have been, under the general protection of the mill Acts. The case of Bryant v. Glidden, 39 Maine, 458, is not in conflict with this view of the law, but supports it.
In all cases when the party is entitled to his damage upon complaint under the mill Act, his common law remedy, by an action, is taken away. Fish v. Framingham Man. Co., 12 Pick., 68; Baird v. Hunter, 12 Pick., 555; Baird v. Wells, 22 Pick., 312.
But when an upper proprietor has actually built or is building a mill on his privilege, a lower proprietor cannot, without a right acquired by grant, prescription or actual use, erect a new dam or raise an old one, so as to destroy the upper mill privilege, simply under a liability to pay damages under the mill Acts, as those Acts do not apply in such a case. Bigelow v. Newell, 10 Pick., 348; Baird v. Wells, *486 22 Pick., 312; R. S., 1840, c. 126, § 2; R. S., 1857, c. 92, § 2.
The lower proprietor cannot therefore erect or maintain his dam in such a manner as to raise the water and obstruct the wheels of the prior occupant above him. His appropriation to that extent, being prior in time, necessarily prevents the proprietor below from raising the water, without interfering with the rightful use already made. Such appropriation of the stream, however, gives the upper proprietor priority of right only so far as the use has been actual. Cary v. Daniels, 8 Met. 466; Simpson v. Seavey, 8 Maine, 138.
The case does not show, that the dam of Dwinel, as it now exists, causes the water to flow back upon the wheels of Veazie’s mills, as they existed at the time said dam was' raised. Nor does it appear that the wheels of the Canal mills, erected since that time, have been obstructed in their operation by means of said dam. Indeed, it may well be doubted whether the water in the mill pond of Dwinel, or in the " basin,” has been materially and permanently raised by the new dam, for the reason that the side dam and sluice, which have not been raised, afford space for the water to pass off freely in that direction. „
But, notwithstanding this dam is thus shown to be within the protection of the mill Acts, and its owner is authorized to maintain a head of water therewith for the operation of ■his mills, he is not authorized, wholly or substantially, to obstruct the navigation of the stream. The river, as we have seen, though not technically navigable is still a floatable stream, and as such, may lawfully be' used as a highway for the public upon which to float boats, rafts, and logs. Of this right, the public cannot be deprived, nor, in its use, unreasonably obstructed. A dam which impedes or obstructs the rights of the public, in floating boats or logs, in a stream in which they can be floated, must be held to be pro tanto a nuisance. Knox v. Chaloner, 42 Maine, 150.
*487 These rights are not necessarily conflicting. On the contrary, if exercised in a reasonable manner, they are materially beneficial to each other. While the mill proprietor may erect and maintain his dam, he must, at the same time, keep open, for the use of the public, a convenient and suitable passage way, through or by his dam. The privileges of the mill owner must be so exercised as not to interfere with the substantial rights of the public in the stream, as a highway, for the purpose of transporting such property as, in its natural capacity, it is capable of floating. The use of both parties must be a reasonable use, and the rights of both must be exercised in a reasonable manner.
The erection and maintenance of water mills has, as we have seen, ever been deemed matter of great public utility by the people of this State. No other branch of industry has received more marked encouragement from our Legislature. So, too, the right of the public to the use of our floatable streams has ever been guarded with jealous care by our Courts. They arc the great highways over which vast amounts of the property of our citizens are transported to market, and without which much of the wealth of the State would be locked up in inaccessible forests. These two great interests mutually sustain each other. Without the mill, the lumber which now floats on our streams from the distant forests would be comparatively valueless, and, without the unobstructed streams on which to float the product of the forest, the mill would bo of little worth. To give either interest absolute prerogative would be destructive to both. Hence the rights of each must be so exercised as not unnecessarily or unreasonably to interfere with or obstruct the rights of the other. And such is the law. The maxim, sic utere tuo ut álienum non laedas, here applies with its full force.
The evidence shows that Dwinel did provide and maintain a convenient and suitable passage way for rafts and lumber, except when the pond was obstructed by edgings and other waste material cast into the stream from the mills. *488 of Yeazie, and also, except at a period of time wben the side dam was out of repair.
The effect of the breach in the dam has been the subject of investigation and adjudication in an action which has heretofore been determined between the parties. That question is no further important than as it may bear upon the question of review now before the Court.
It was declared by this Court, in the case of Dwinel v. Veazie, 44 Maine, 167, that the defendant had the right to use the water above his mills to float logs to them, and also to the use of the water to float rafts and lumber to market, and also to float away the waste stuff from his mills so far as such use was reasonable and conformable to the usages and wants of the community.
This rule, it will be observed, does not afford a very distinct and practical illustration of the rights of the parties. IIow far, it may well be asked, is it reasonable to cast waste material into the stream, which is by law deemed a public highway, to float whither it may, or to sink and obstruct such way, without any direction except mere chance ? The testimony shows that the waste from the manufacture of lumber, as now conducted, has a tendency to sink rapidly, to accumulate in masses, and obstruct the streams into which it is cast.' Do the reasonable wants of the community require that such material should be cast at random into our streams, to float whither the currents or the winds may direct, or.to sink, and obstruct navigation as it may ?
The rights of parties are to be determined by law and not by any local custom or usage, unless there be proof that such custom or usage is certain, general, frequent, and so ancient as to be generally known and acted upon, and unless it shall be adjudged to be reasonable. Leach v. Perkins, 17 Maine, 462.
All hindrances or obstructions to navigation, without direct authority from the Legislature, are public nuisances. Williams v. Wilcox, 8 Ad. and Ell., 314; Knox v. Chaloner, 42 Maine, 150.
*489 Any unauthorized obstruction in a highway is a public nuisance. Lew. Cr. Law, 526.
A temporary occupation of a part of a street or highway by persons engaged in building, or in receiving or delivering goods from stores or warehouses, or the like, is allowed from the necessity of the case; but a systematic and continued encroachment upon the street, though for the purpose of carrying on a lawful business, is unjustifiable. People v. Cunningham, 1 Denio, 524.
It is a nuisance at common law to dig a ditch or make a hedge across a highway; to erect a fence or gate across it; to deposit lime or gravel or bricks upon it; or pile logs or lumber or stones therein, or to extend a rope across the same. 1 Hawk. P. C., c. 78, § 48; Gregory v. Com., 2 Dana, 417 ; Bush v. Steinman, 1 Bos. and Pul., 404; Burgess v. Gray, 1 Man., Gr. & Sct., 578; Frost v. Portland, 11 Maine, 271; Johnson v. Whitefield, 18 Maine, 268; French v. Brunswick, 21 Maine, 29 ; Stetson v. Faxon, 19 Pick., 147.
The navigation of public rivers is governed by the same principles. The right of the citizen to use such rivers as a highway must everywhere, within reasonable limits, accommodate itself to the same rules as in the use of public highways. Angell on Highways, § 229 ; Stetson v. Faxon, 19 Pick., 147.
All unauthorized intrusions upon public highways, for purposes unconnected with the rights of navigation or passage, are nuisances in judgment of law. Com. v. Caldwell, 1 Dal., 150.
It was held in Com. v. Fleming, Lew. Cr. L., 534, that logs lying in the river Susquehanna, in places where the bed of the river was covered with water at the time, and susceptible of being used for purposes of navigation, if deposited there for mere private convenience, and for no purpose connected with the right of navigation, constituted a nuisance in judgment of law.
Lord Hale, in his treatise de portibus maris, notices *490 among others the following nuisances that may be committed to ports; tilting or choking- up the port by sinking vessels, or throwing out filth or trash: decays of wharves, piers or quays; leaving anchors without buoys; building new weirs or enhancing old; the straitening of the port by building too far into the water, and the suffering a port or passage to be filled or stopped up.
The authorities, ancient and modern, are all consistent, and point in one direction. Highways, whether on land or water, are designed for thé accommodation of the public, for travel or transportation, and any unauthorized or unreasonable obstruction thereof is a public nuisance in judgment of the law. They cannot be made the receptacles of waste materials, filth or trash, nor the depositaries of valuable property even, so as to obstruct their use as public highways. All such obstructions, in the eye of the law, are deemed unreasonable-.
As has already been remarked, the owner of a mill dam upon a public stream is bound to provide a suitable, safe and convenient passage through or by his dam, for purposes of navigation. But such passage way or channel can only be used for purposes of navigation. It would be equally a violation of law to encumber it with unauthorized obstructions, as thus to encumber the stream in its natural channel or course.
If, therefore, any person obstruct a stream, which is by law a public highway, by casting therein waste material, filth or trash, or by depositing material of any description, except as connected with the reasonable use of such stream as a highway, or by direct authority of law, he does it at his peril; — it is a public nuisance for which he would be liable to an indictment, and to an action at law by any individual who should be specially damaged thereby. Angell on Watercourses, § 567 ; Cole v. Sprowl, 35 Maine, 161. No length of timq can legitimate or enable a party to prescribe for a public nuisance. People v. Cunningham, 1 *491 Denio, 524; Mills v. Hall, 9 Wend., 315; Commonwealth v. Upton, 6 Gray, 473; Brown v. Watson, 47 Maine, 161.
It is contended that Yeazie has acquired a right by prescription to a passage through the old sluice in Dwinel’s main dam, for slabs and other waste froih his mills. The evidence does not sustain this proposition. It does appear, that, for many years, there was a sluice or waste way through Dwinel’s dam, which was used by the owners of that dam to discharge waste and other materials from their mill pond, and through which, at high stages of water, slabs and waste from Yeazie’s mills also passed. But there is no evidence tending to show that the owners or occupants of Veazie’s mills ever claimed the right to control or use that sluice for such purpose, or, in fact, ever exercised such control. But, on the contrary, the evidence does show that the occupants of those mills have cast their slabs, edgings and waste into the stream, to sink or float, without direction or control on their part, and that, while some portions thereof have undoubtedly passed over Dwinel’s main dam, or through the sluice therein, and other portions through the board sluice and over the side dam, other portions, still, have sunk in the "basin,” choked up the.rafting channel, and, to some extent, obstructed the mill poud of Dwinel. This practice, however, if exercised under a claim of right, was manifestly under the claim of a right to cast waste into the stream, there to remain without further direction or control, and not under a claim to have it deposited to remain in a particular place, or to float it through a particular channel. Such casual passage of slabs through the sluice in Dwinel’s dam would give Yeazie no prescriptive right therein. As well might one who should, without authority, turn animals upon the highway to graze,' claim a prescriptive right to all the land upon which those animals might chance to stray. A prescriptive right can only be obtained by adverse user, under claim of right. Nor would the sanction of casting his waste into the stream, or the channel provided for rafting-boards and running logs, it matters not how long this prac *492 tice has been continued, give a prescriptive right to continue the same, if the stream or channel was thereby obstructed. Knox v. Chaloner, 42 Maine, 150 ; Rex v. Ward, 4 Ad. & El., 384; Gates v. Blencoe, 2 Dana, 158; Angell on Watercourses, § 562.
The evidence establishes the fact that Dwinel’s main dam has been abutted upon and connected with Webster’s Island, substantially as it now is, for more than half a century. Under such circumstances a right thus to maintain it must be presumed. We do not find any evidence tending to establish such acts of trespass by Dwinel of the lands of Veazie, situate on Webster’s Island, as are described in either of his writs.
It is admitted that Gen. Veazie has not run his mill himself since Dec., 1854, but that the mills since that time have been worked by his lessees. The defendant was not liable for the tortious acts of his lessees, unless authorized by him, anterior to the Act of April 2d, 1859, c. 98. Dwinel v. Veazie, 44 Maine, 167.
The leases in the case show that they had no such authority as would render Veazie liable for their acts prior to that time. ■
By the Act above cited, the owner of any mill, used for the purpose of manufacturing lumber, is made liable for the act of his tenant in the unlawful obstruction or diversion of the water of any river or stream caused by the slabs or other mill waste from his mill. This Act is prospective in its terms.
David N. Estabrooks testified in April, 1861, among other things, as •follows : — "I should say that the Dwinel mill pond had been filled up the last three or four years to a certain extent. * * * * I found it difficult to float logs down our channel when I had cleared it out, it had so filled up with edgings, slabs, &c. The reason why it filled up so fast is as follows : — They cut their raft channel so far up, it lessened the current in our channel, consequently the edgings would sink and fill it up. * * ? We hung a boom *493 across the old channel, at the head of Treat and Webster island, after Gen. Veazie cut his raft channel last fall, (I860,) to guide our logs by that channel; used to take it out of the way when we got through turning in, until towards fall the slabs and edgings rolled under and caught, and it was difficult to move it and there it is now.”
The "new cut” was made in August, 1860. This, it would seem, caused the current in the old channel to move slow, and the edgings, &c., to sink more rapidly, and thus to obstruct the passage for logs to Dwinel’s mills. The same fall, it does not appear precisely at what time, Dwinel’s boom across the old channel became a fixture, under such circumstances as to show that it must have contributed in no small degree to the same result.
Now, although Veazie had no legal right, as we have already seen, to obstruct this raft channel by the waste from his mill, and notwithstanding Dwinel had a right to direct his logs floating in that channel into his mill pond, and, for that purpose, it would not be unreasonable for him to use temporary guide booms, which should not obstruct the passage through said channel, as a teamster may temporarily encumber the highway while loading or unloading his team, he was not authorized to permanently obstruct said channel for such purpose. While so doing he was himself contributing to the production of the very evil of which he complains, and during that period he has no remedy against a co-contributor to the same injury. It however appearing from the evidence that he received some injury after Veazie became liable by the Act of 1859, and before his boom became a permanent obstruction, he is entitled to some damage. But the extent of that injury, before he became a contributor thereto, not appearing, the damages which he is entitled to recover must be nominal only.
The foregoing facts and considerations bring us to the following conclusion, to wit: —
The bill in equity must be dismissed, with costs for the defendants.
*494 In the two actions of Veazie v. Dwinel, nonsuits are to be entered.
In the action Dwinel v. Veazie, a default is to be entered. Judgment for nominal damages only.
This brings us to the consideration of the only remaining question: the petition for review.
The action now sought to be reviewed has been twice before a jury, and as many times before the law Court, where it has received a full, and, apparently, a careful examination. Still the defendant in that case, impressed with a belief that the merits of his case have not been fully understood either by Court or jury, and that this is made apparent by the additional testimony now introduced, presents his case again under a petition for review, and asks that it may be reconsidered.
It is desirable that there should be a termination to litigation, and equally as desirable that, when ended, parties should feel that they have been fully heard and their cases maturely considered.
Has this been done in the case now under consideration ? The first verdict was set aside, in consequence of a failure on the part of the presiding Justice to present, to the consideration of the jury, all the legal elements that might influence their judgment in determining the question of damages. The second jury trial was had upon legal principles, which the Court, on deliberation, had determined to be applicable to the case, and of the soundness of which, upon reconsideration, they were fully satisfied. Yet it is insisted, by the defendant, that his case was not understood, and that the law was erroneously applied through the inadvertence of the Court.
The legal proposition stated to the jury at the trial, and which is supposed to be erroneous and prejudicial to the defendant, is as follows: — "If the defendant effected such passage, when it was effected, by cutting away and removing a portion of bank of drift stuff and edgings, the fact that he was (if he were) the riparian proprietor of the land on the *495 west bank of the river opposite to the bank of drift stuff and edgings, in the river, would make no difference in the rights and liabilities of the defendant in effecting such passage for his rafts and lumber — that his rights and liabilities, as to effecting such passage must be considered as the same in this action whether he was or was not such riparian proprietor.”
To understand fully the application of this proposition, it will be necessary to consider the facts clearly deducible from the evidence then before the jury, to which the instruction is applicable, and also a remark of the Judge preceding the one just quoted, and of which complaint is made.
On the east side of the rafting channel, Dwinel, with the implied assent of Yeazie, had caused piers to be erected, with booms connecting the same, which served as guides to keep logs and rafts floating to Dwind’s mills, or through the board shiice, in the channel.
Into this channel or passage, the occupants of Yeazio’s mills have cast edgings and other waste, without limitation. This waste had floated against and lodged upon and under the piers and booms until it had formed an impenetrable " reef ” or bank on the east side of said channel. It had also sunk in the bottom thereof, and thus raised the bed of the river, forming an artificial channel in which the water was much more elevated than it was immediately east of the bank or "reef” of edging, &c. The waste materials from Yoazie’s mills had also lodged in and obstructed the channel, to a considerable extent, most of the way to the board sluice through the side dam. This was the condition of things when the breach occurred in the side dam. It was the duty of Dwinel to have repaired that breach as soon as it was reasonably practicable; but he wilfully or negligently omitted to do so, though the evidence shows that the repairs could have been made for an inconsiderable sum. With this breach in the dam, and with the channel thus partially obstructed, it became difficult, if not impracticable, to run rafts through the board sluice. Then it was that Yeazie, *496 instead of repairing the breach in the dam, at a much greater expense, cut a channel through the " reef,” or bank of edgings to that breach, 'the effect of which was largely to increase the breach and wholly to divert the water from the former channel and the mills of the plaintiff.
It was in view of these facts that the Judge gave the instruction of which complaint is made, having, however, previously instructed the jury, — "That if the plaintiff did not provide and keep in repair a suitable and proper way or passage for the defendant’s rafts and lumber through the side dam, although the defendant had the right to effect such passage, yet he had not the right to effect it in a manner wanton, unreasonable, and unreasonably injurious to the plaintiff, and if he did effect a passage in such manner, he would be liable for any damage caused to him by such unreasonable proceedings.”
The Court has decided that these instructions were not erroneous.
Assuming the facts to be as claimed by the petitioner — that it was the duty of Dwinel to repáir the breach, and that the "reef” was placed by Dwinel, without authority, on the land of Yeazie, still the instruction would be manifestly correct. In that case it would be‘the duty of Yeazie to repair this breach or open a channel in a reasonable manner, and without causing unnecessary injury to Dwinel. So use your own as not to injure another, is a maxim of the law, and molliter manas imposuit, is a necessary plea to justify a charge of violence in ejecting an admitted trespasser from one’s premises. In abating a nuisance, a party is bound to use reasonable care that no more damage be done than is necessary for effecting his purpose. The abatement should be limited to its necessities, and with the least practicable injury to the object which creates the grievance. Gates v. Blencoe, 2 Dana, 158; Prescott v. Williams, 21 Pick., 241; Moffett v. Brewer, 1 Green. Iowa; 348 ; Angell on Watercourses, § 390; Com. Dig., action on the case for nuisance, D 4.
*497 But when it is considered that the raft channel had been raised, and also obstructed by the unauthorized acts of Veazie or his tenants, and that the '' cut,” made by him, rendered that channel absolutely useless, when, but for those obstructions, it probably -would not have been injuriously affected by the cut, the instructions of the Judge became too obviously appropriate to be made more plain by illustration or argument. — The authorities cited by the petitioner on this point do not apply.
That the jury found, under this instruction, that the course pursued by Veazie was unnecessarily and unreasonably injurious to Dwinel, is apparent. The Court, from the evidence, would have come to the same conclusion, but the damages assessed were, in the opinion of the Court, too large, and hence the plaintiff was required to remit a portion of his verdict, or go to a new trial. The case is not one in which damages can be assessed with mathematical accuracy, but must depend upon the judgment of men, in view of all the facts and circumstances of the case. There is room for error. But, from a careful review of the evidence, we are not satisfied that the Court has erred in the order heretofore made.
Complaint is also made of the manner in which the learned Judge, who tried the case, presented it to the jury, and this is one of the grounds on which a review is asked.
The case finds that the counsel for the defendant presented twelve specific requests for instructions, in writing, and that the Judge presiding, after having stated the case to the jury and spoken of its importance to the parties, and the carefulness with which it should be tried, stated to the jury that the defendant’s counsel had presented his views of the law in the form of requests for instructions to be given to the jury, which requests he would read to them — and he then read to the jury the twelve requests made by the defendant’s counsel, for instruction to be given them, and said to them, that the legal propositions contained in those requested instructions were correct, so far as they were *498 applicable to this case, and that he gave them all those instructions, as requested, except so far as they might be qualified by the subsequent instructions which he should give them, and then proceeded to give the very full and explicit instructions reported in the case.
Of the instructions thus given, particular exception was taken to the one which we have already considered.
We are unable to perceive anything in.the history of the case, or in the manner in which it was presented to the jury, by the learned and conscientious Judge who tried it, as it is presented, which calls for, or can justify or excuse the complaining, acrimonious, and censorious course of remark indulged in.by counsel. He had undoubtedly presented his views of both law and fact to the jury, and then restated his legal propositions, in form of requests for instructions, which were read by the Court to the jury, and their correctness affirmed, except So far as he should qualify them by remarks which he then proceeded to make. We see not how with propriety he could have done more.
The only remaining point for consideration is the newly discovered evidence. The important fact presented by this new evidence, is this: — That in the year 1860, a new cut commencing at the same point as the old, was made by Veazie through the "reef” of edgings, &c., directly to the boom and sluice in the side dam, and that this cut has occasioned no material injury to the old channel; and from this fact it is argued that the injury complained of by Dwinel in the original action must have arisen, if sustained, from some cause other than the cut of 1854. This argument would have weight and be entitled to‘ serious consideration, were all the other facts bearing upon the point the same as in the other case.
But when it is considered that the only outlet for this new cut is through the board sluice, while the outlet for the cut of 1854 was through the "gap” or breach in the dam, which presented an opening some two feet deeper and of nearly double the width of the board sluice, the force of the *499 new testimony is much diminished, if not wholly destroyed. We think it by no means establishes the fact that the cut of 1854 did not produce the injury imputed to it. No other new fact has been brought to our attention which will authorize us to review the former judgment.

Petition dismissed with costs for respondent.

Appleton, C. J., Cutting, Davis and Walton, JJ., concurred.
Kent, J., concurred in the opinion in all the cases, except the petition for a new trial; and in that, dissented.