ANDREW FOLSOM *vs.* WILLIAM P. FREEBORN, Town Treasurer of Warren.

In A. D. 1794, D. received permission from the General Assembly to build a toll-bridge across one of the navigable rivers of the State. The son of D., who was also his devisee, built at one end of the bridge a mill, using for motive power a water-wheel placed between the west pier of the bridge and the west abutment, which were so extended in length as to make the intervening space a tidal raceway. A subsequent owner of the bridge and mill conveyed the bridge to the State in 1870, with full covenants of warranty. Afterwards the mill was conveyed to A. During 1873, the mill-wheel was not in the raceway, being taken out to make room for a better one, which in November, 1873, was ready to be set up.

---

Meanwhile the town of Warren in 1873, under authority from the General Assembly, proceeded to rebuild the bridge and make rip-rap work around the west abutment: stones were carried into the raceway by the current, into the wheel-pit, and along A.'s water front. A. was obliged to remove these before he could set his new wheel, and after getting it into place in May, 1874, he was obliged repeatedly to take up the wheel to clear away new deposits of stones which formed themselves about it.

In an action by A. against the town of Warren for injury caused by the stones in the raceway and for obstruction in the water approaches to his land:

*Held,* that A. had no prescriptive right to maintain the mill and water-wheel, nor any prescriptive right to have the water flow unobstructed through the raceway, — the enjoyment of the water-wheel and the water-way depending on the bridge, which was conveyed to the State free from incumbrances.

*Held,* further, that the opportunity enjoyed by A. to use tide-water as a motive power was not an easement.

*Held,* further, that A. could not maintain his action on the ground of disturbance to his possession or actual enjoyment.

Prescription is a legal fiction to quiet ancient possession.

For obstructions in the water approaches to his land A. could maintain his action, but the utmost possible damages being nominal:

*Held,* that judgment should be given for the defendant if the defendant would waive costs.

PLAINTIFF's petition for a new trial. The facts are stated in the opinion of the court.

*James Tillinghast* and *Bosworth & Champlin,* for plaintiff.

The action of the presiding justice at the trial before a jury in directing a verdict for the defendant was erroneous, and the case should have been submitted to the jury.

*First.* On the question of damage to the race-way, or water privilege.

*Second.* On the question of damage caused by filling up the water around said platform wharf.

I. A municipal corporation is liable for an act which would give an action against an individual, if the act is done by authority of the corporation, or is ratified by the corporation. *Clark* v. *Peckham,* 9 R. I. 455, 472.

The principle is the same even if the acts complained of were committed maliciously, if the agents of the corporation committing them proceeded in the line of their duty.

II. An individual may acquire a right by grant or prescription in a public navigable river. *Warren* v. *Prideaux,* 1 Mod. 104; *Carter et al.* v. *Murcot et al.* 4 Burr. 2162; *Trotter* v. *Harris,* 2 Younge & Jervis, 285; *Parker* v. *Cutler Milldam Company,* 20 Me. 353; *State* v. *Jersey City,* 25 N. J. Law, 525; *Gough* v. *Bell,*

21 N. J. Law, 156; *Palmer* v. *Hicks*, 6 Johns. Rep. 133; *Peck* v. *Lockwood*, 5 Conn. 22.  Also see *Commonwealth* v. *Charlestown*, 1 Pick. 180; *Commissioners of Canal Fund* v. *Kempshall*, 26 Wend. 404; *Engs* v. *Peckham*, 11 R. I. 210, and cases cited by complainant's counsel.

III.  Riparian owners have a right to construct wharves, buildings, and other improvements in front of their lands, and in and over the public navigable waters, so long as the public servitude is not thereby impaired.  They are part of the realty to which they attach and pass with it.  Whether such wharves or other improvements obstruct navigation is a question of fact and not a question of law.  *Grant* v. *City of Davenport*, 18 Iowa, 179; *Gough* v. *Bell*, 21 N. J. Law, 156; *Simons* v. *French*, 25 Conn. 346; *Commonwealth* v. *Crowninshield*, 2 Dane's Abridg. 697; *Gray* v. *Bartlett*, 20 Pick. 186; *Veazie* v. *Dwinel*, 50 Me. 479, 490; *Clark* v. *Peckham*, 10 R. I. 35; *Thornton* v. *Grant*, 10 R. I. 477.

A riparian proprietor, as against an individual, has a right to wharf out into a public navigable stream, even though he thereby creates a public nuisance.  *Low* v. *Knowlton*, 26 Me. 128; *Frink* v. *Lawrence*, 20 Conn. 117.

IV.  A person constructing wharves, buildings, or other improvements in and over public navigable waters, has all the rights incident to ownership, including the right of wharfage and the right of passage over and upon the waters around said wharf.  The riparian owner has a right of access to his land by water, and no one can do anything to make it less accessible without being liable for damages; and even if he does not have an exclusive right to the use of the water around his wharf, it is enough that he has a right in common with others.  *Brayton* v. *Fall River*, 113 Mass. 218; *Clark* v. *Peckham*, 9 R. I. 455, 472; 10 R. I. 35.

The right to the use of the water of a public navigable stream around a wharf, or in front of the land of a riparian proprietor, for any lawful purpose, although it may be a right which is not exclusive, is a subject for damage.  *Blood et al.* v. *Nashua & Lowell R. R. Co.* 2 Gray, 137; *Commissioners of Canal Fund* v. *Kempshall*, 26 Wend. 404; *Lawrence* v. *Inhabitants of Fair Haven*, 5 Gray, 110.

*Browne & Van Slyck* and *George L. Cooke, Jr.*, for defendant.

*February* 5, 1881. DURFEE, C. J. This is a petition for the new trial of an action on the case against the town of Warren. The grounds on which the plaintiff sought to maintain his action may be stated as follows: In 1794, one Duncan Kelley was the owner of certain real estate, consisting of the Homestead or Ferry House lot, so called, and the buildings thereon, situated in Barrington, on the west bank of Palmer's River, and also of the ferry established across the river. In that year the General Assembly granted him authority to build a bridge across the river at the place of the ferry, and to do whatever might be necessary to its maintenance as a toll-bridge, providing however a draw for the free passage of vessels. Under this authority the toll-bridge, afterwards known as Kelley's Bridge, was constructed and maintained. In 1812, Duncan Kelley died leaving a will by which he devised his real estate, together with the bridge, to his son John, who subsequently erected, a little south of the bridge and near the west bank of the river, and over the river, the tide-mill mentioned in the declaration. John Kelley died in 1862, and subsequently all his right, title, and interest in the bridge and tide-mill, and in a small part of the adjoining upland, passed to Lewis T. Hoar and Ezra M. Martin, by whom the bridge was conveyed to the State, August 24, 1870, and subsequently the mill was conveyed to the plaintiff's grantor. The bridge is built on two abutments and two piers. The west abutment and west pier were extended southward beyond the line of the bridge by John Kelley, when he erected the mill, and form, as extended, the raceway of the mill. The mill was formerly operated by the pressure of the ebbing and flowing tide on a bucket-wheel set in the raceway. This wheel was taken out previous to 1873, and in its absence the mill was run by a portable steam-engine. In August, 1873, the committee of the town of Warren, appointed under an act of the General Assembly authorizing the town to rebuild the bridge, commenced work on it and completed the work before the end of the year. During the work stones of various sizes, large and small, were thrown around the west abutment at its north end, both in and out of the raceway, for the purpose of rip-rapping it. These stones were carried in large

numbers down the raceway and into the wheel-pit. The testimony of experts was introduced to show that the rip-rapping was bad workmanship. Meanwhile the plaintiff, who had been at work since January, 1873, making a patent tide-wheel for the mill, completed it and had it ready to put down in November, 1873. The wheel, to work well, had to be submerged. The raceway, unobstructed, contained water enough to submerge it at mean low tide, but, being shoaled by the stones, was too shallow, and accordingly the plaintiff spent the rest of the fall, the ensuing winter, and part of the next spring in removing the stones. He first put his wheel in, in May, 1874, but the raceway again filling with stones, he was compelled to take it out and remove the stones, and this work he repeated several times. The principal purpose of the action was to recover damages for the injury which the plaintiff claims to have sustained from the stones thrown or carried into the raceway.

The plaintiff also introduced testimony to show that the south end of the extension of the west abutment was constructed so that it might be used as a wharf for the lading and unlading of vessels, and that vessels bringing five or six thousand bushels of corn used to come there, though the approach was somewhat difficult. He further submitted testimony to show that the water about the wharf had been shoaled or reduced by the drifting of the stones used in rip-rapping, and that since the rip-rapping vessels had come to the wharf, one of which touched bottom at the stern, grounding on a heap of stones in line with the raceway.

After the plaintiff had introduced testimony to prove his case as above stated, the court ruled that there was no evidence on which the action could be maintained, and instructed the jury to return a verdict for the defendants. The jury having done so, the plaintiff petitions for a new trial for error in the ruling.

In this State, as we have often decided, the fee of the soil under tide-water, and within its ordinary ebb and flow, is in the State. The riparian owners are, or at least were, until the recent statute, Pub. Laws R. I. cap. 611, § 5, of March 30, 1877, permitted to build and maintain wharves in front of their land, provided they are so built as not to impede navigation. They may also erect other structures in or over tide-water in front of

their lands, where they do not interfere with the public right of navigation, and maintain and enjoy them against everybody but the State. And even if such a structure should happen to encroach upon the public right so as to be a nuisance a.,common law, the owner of it would nevertheless be entitled to the protection of the law against a mere trespasser, or even against persons navigating the water, if they could by the exercise of reasonable care avoid it and still enjoy the public right. *Bowden* v. *Lewis, ante*, p. 189, and cases there cited.

These principles, however, are not sufficient to support the plaintiff's action in so far as it is brought to recover damages for shoaling or obstructing the so called raceway. The gist of the action in that regard is, not injury to any tangible piece of property, like a vessel or other structure belonging to the plaintiff, movable or fixed in the public water, but injury to an alleged incorporeal right or easement, involving an appropriation of a portion of the tidal flow to private uses as the motive power of a mill. Of course if the plaintiff is entitled to any such novel and extraordinary right or easement, it is for him to establish his title, inasmuch as it is in derogation of the public rights, being to a great extent at least incompatible with them. The plaintiff contends that he has established his title in two ways : namely, *first*, by prescription or legislative grant presumably lost ; and, *second*, by proof of possession or actual enjoyment.

The action is not maintainable on the ground of prescription in the stricter meaning of the word, for nothing can be claimed by prescription which owes its origin to matter of record, and it is only by legislative grant, which is matter of record, that an individual can acquire any private right or interest in tide-water. 3 Greenleaf's Cruise, *422. Can the action be maintained on the ground of a legislative grant the record of which may be presumed to have been lost ? It is well settled that title to property, both corporeal and incorporeal, may rest on such a presumption. In *Read* v. *Brookman*, 3 Term Rep. 151, 158, decided in 1789, Mr. Justice Buller said : " For these last two hundred years it has been considered as clear law that grants, letters patent, and records may be presumed from length of time." In support of this remark he referred to the leading case of *Bedle* v. *Beard*, 12 Rep.

5.   In the *Mayor of Kingston upon Hull* v. *Horner*, 1 Cowp. 102, it was held that a grant or charter from the crown was presumable under circumstances after a possession of three hundred and fifty years.   In *Powell* v. *Milbanke*, 1 Cowp. 103, note, Lord Mansfield left it to a jury to presume a royal grant of an advowson upon two presentations and a long possession.   The latter decision did not escape criticism.   Lord Chief Baron Eyre said if it was law, presumption was run mad.   And Lord Eldon said the direction to presume a grant was very dangerous, if there was nothing more than mere enjoyment for a great length of time, and two presentations stolen from the crown.   In *Gibson* v. *Clark*, 1 Jac. & W. 159, a grant from the crown of an advowson, excepted from a former grant, was held to be presumable after one hundred and thirty-three years' possession and three presentations.   In *Roe on dem. Johnson & Humphrey* v. *Ireland*, 11 East, 280, it was held that a royal grant might be presumed on proof of a usage of two hundred years, aided by a parliamentary survey. In these cases the lapse of time was much greater than in the case at bar (*i. e.* about sixty years), and in some of them the presumption was favored by circumstances.   In *Trotter* v. *Harris*, 2 You. & Jer. 285, in an action for the disturbance of a ferry against a mere intruder, it was decided that the jury might presume that the ferry had a legal origin from an user of thirty-five years.   The case, however, does not seem to have been very carefully considered, and it may be doubted whether the decision could have been the same against anybody but an intruder.   In *Vooght* v. *Winch*, 2 B. & A. 662, it was held that a right to raise the level of a navigable river could not be presumed from a practice of twenty years.

The law has been held to be the same in this country.   In *Jackson* v. *McCall*, 10 Johns. Rep. 377, it was held after less than forty years' possession of a tract of land and proof of a prior order of council for the survey of the lot, and of an actual survey thereof accordingly, that the jury were properly instructed to presume that a patent had been duly issued.   In *Crooker* v. *Pendleton*, 23 Me. 339, it was held that a state grant might be presumed from more than sixty years' possession fortified by circumstances and tradition.   And in *Mather* v. *The Ministers of Trinity*

*Church*, 3 Serg. & R. 509, a naked possession for ninety years was held sufficient. See, also, *Carter* v. *Murcot*, 4 Burr. 2162; *Gould* v. *James*, 6 Cow. 369; *Rogers* v. *Jones*, 1 Wend. 237; *Engs* v. *Peckham*, 11 R. I. 210, 219.

The foregoing citations show the course of decision both in England and in this country. The only rule deducible from them is, that title by lost grant against either the Crown or the State may be presumed from possession of long duration, and from shorter possession coupled with corroborative circumstances. How short the time may be is not determined, though it has been said that a longer time is required as against the State than as against an individual, who may be expected to be more alert to look out for his interests. The cases are not uniform in regard to the precise ground of the presumption. The doctrine of some of the cases seems to be that the presumption is one of fact for the jury. Other cases treat it as a sort of legal fiction invented by the courts to quiet ancient possessions. This was the view of Lord Mansfield, who pronounced the judgment in *The Mayor of Kingston upon Hull* v. *Horner*, 1 Cowp. 102, and who afterwards, referring to it in *Eldridge* v. *Knott*, 1 Cowp. 214, said that the reason why a royal grant or charter may be presumed was, "not that in such cases the court really thinks a grant has been made, because it is not probable a grant should have existed without its being upon record; but they presume the fact for the purpose and from the principle of quieting the possession." This, too, is the doctrine of the Supreme Court of New York in *Jackson* v. *McCall*, 10 Johns. Rep. 377. See, also, *Crooker* v. *Pendleton*, 23 Me. 339.

If it be the true doctrine that the jury is to find that in point of fact the grant was made and the record of it lost, then in our opinion there was no evidence in the case at bar to warrant such a finding, for with so recent a grant, the loss could not have occurred without something in the public records to show that it had or might have occurred; whereas it is perfectly easy to believe in the circumstances that the mill may have been built and maintained without any grant. We think, however, with Lord Mansfield that the presumption must be held to rest on a legal fiction, and consequently that it is for the court to determine

under what conditions it may be raised. The courts have done little, as we have before intimated, toward settling any rule for such a determination. The cases, however, contain some instructive suggestions. For instance, in *Cross* v. *The Mayor of Morristown*, 18 N. J. Eq. 305, 311, Chief Justice Beasley directs attention to the distinction between property which vests in the Crown or State for itself, so to speak, and property which vests in it as *parens patriæ*, or as a repository of the public rights, and intimates that a lost grant of the former will be more readily presumed than of the latter kind of property. And so too, advancing along the same line of thought, it is well settled that a lost grant from the State will not be presumed in support of any claim of right to continue a public nuisance, and this not merely where the nuisance is deleterious to health, but also where it obstructs a highway or navigable river. *Morton* v. *Moore*, 15 Gray, 573 ; *Tainter* v. *The Mayor of Morristown*, 19 N. J. Eq. 46 ; *Commonwealth* v. *Upton*, 6 Gray, 473, 476 ; *The People* v. *Cunningham*, 1 Denio, 524 ; *Mills* v. *Hall*, 9 Wend. 315 ; *Arundel* v. *McCulloch*, 10 Mass. 70 ; *Renwick* v. *Morris*, 3 Hill N. Y. 621.

The defendant contends that the erection here was a public nuisance, and that therefore a lost grant cannot be presumed. But this is not entirely clear, for it is not every erection in a navigable river, even if it extends below low-water mark, that is a public nuisance ; whether it is or not is a question of fact for the jury, unless it too plainly obstructs navigation to admit of a doubt. *Regina* v. *Betts*, 16 Q. B. 1022 ; *Regina* v. *Russell*, 3 El. & B. 942 ; *Wetmore* v. *The Atlantic White Lead Co.* 37 Barb. S. C. 70 ; *Thornton* v. *Grant*, 10 R. I. 477 ; though, if the erection does extend below low-water mark, and is not ancillary to navigation, it may perhaps be regarded as *primâ facie* a public nuisance. *Veazie* v. *Dwinel*, 50 Me. 479, 489 ; *Gunter* v. *Geary*, 1 Cal. 462 ; *The People* v. *Vanderbilt*, 28 N. Y. 396.

But in our opinion the question here may be decided without deciding whether the erection was a public nuisance or not. There are two things which the plaintiff claims : namely, *first*, a right to maintain his mill and water-wheel ; and *second*, a private easement or privilege in the river, by virtue of which he was entitled to have the tide flow and reflow through his so-called

raceway without obstruction or diminution. The first might have existed without the second, for though the water-wheel would be useless without water to move it, yet the owner might be content to take the water as it came to him, relying on the probability that he would not be molested, without acquiring from the State any private easement or privilege in it. And certainly so long as the owner of the mill continued to be the owner of the bridge such a reliance was not ill-founded. The privilege, as it existed *de facto*, was dependent on the bridge; for if the bridge were removed, or if the aperture between the west abutment and pier were closed, it would be ruined. If therefore the easement existed as of right, the bridge was subjected to a sort of servitude for its enjoyment. But when the owner sold the bridge to the State, which was before he sold the mill, he conveyed it without any reservation, and with warranty and a covenant that it was free of all incumbrances whatsoever. It seems to us that if the owner of the mill had, or assumed to have, by grant from the State, the record of which was presumably lost, the easement or privilege which the plaintiff now claims, then was the time of all times for him to assert it, and that, as he did not then assert it, it cannot now be presumed that any such grant ever existed. The State, taking under the conveyance, had a right to suppose that it was not only getting the bridge, but that it was also getting back again all the right in the river which it had originally conceded to the grantor's ancestor in title. And whatever right the State had in this regard, the defendant, acting under the authority of the State, likewise had.

We are therefore not prepared to grant a new trial for error in this particular.

The next question is, Was the plaintiff entitled to maintain his action on the ground of possession or actual enjoyment? Strictly speaking an easement, being incorporeal, is incapable of possession, and at the time the rip-rapping was done the plaintiff was not using the tides of the river to run his mill. The water-wheel having been removed, he was in possession of nothing but the mill and its corporeal supports and appendages, and the possession of them would not draw after it possession of any easement or privilege in the flow of the river, unless an easement or privi-

lege existed and was appurtenant to them, and that the plaintiff did not show. He showed simply that he had an opportunity, on account of the situation of the mill, to use the tides as a motive power for it, so long as the so-called raceway was left unobstructed. But such an opportunity is not an easement, and it does not entitle a person who enjoys it to sue for disturbance of his enjoyment. Moreover the defendants were not mere wrongdoers, but acted under leave of the State, and might, if they had seen fit, have closed the aperture in the bridge, thus entirely stopping the flow of the river through it. We think therefore that the plaintiff was not entitled to maintain his action on the ground of possession or actual enjoyment.

The final question is, Was the plaintiff entitled to maintain his action for injury resulting from the stones about his wharf, supposing their presence there was attributable to the culpable carelessness of the defendant? The defendant contends that the action was not maintainable because what the plaintiff calls his wharf was not a wharf but a mere platform on which goods could be landed. We do not think this defence is tenable. The plaintiff was a riparian proprietor, and as such had a distinct right of unobstructed access to his riparian estate by way of the river, and was therefore entitled to an action for any injury from which he suffered in the use of the right. We do not see how he can be held to have forfeited this right by projecting a structure into the river, which facilitated its enjoyment, simply because the structure did not deserve to be called a wharf. It answered the purposes of a wharf for him. *Lyon* v. *Fishmongers' Company*, L. R. 1 App. Cas. 662; *The Duke of Buccleuch* v. *The Metropolitan Board of Works*, L. R. 5 H. L. 418; *The Metropolitan Board of Works* v. *McCarthy*, L. R. 7 H. L. 243; *Rose* v. *Groves*, 5 M. & G. 613; also, 6 Scott N. R. 645; *Thornton* v. *Grant*, 10 R. I. 477, 487; *Brayton* v. *Fall River*, 113 Mass. 218.

The defendant contends that there was no positive evidence that the stones about the wharf were drifted there directly from the rip-rapping, inasmuch as they may have got there by the act of the plaintiff's own employees. In our opinion the evidence on the point was not decisive, but nevertheless we are inclined

to think there was evidence on which the plaintiff was entitled to go to the jury. The damages, however, which the plaintiff sustained in this regard were merely nominal. It is not at all probable that any action would have been brought for them alone. A new trial will therefore be denied if the defendant will consent to a judgment without costs. Otherwise a new trial limited to this part of the plaintiff's claim will be granted.

*Order accordingly.*

February 8, 1881, the defendant elected to take judgment in his favor without costs. *Petition dismissed.*