[Civ. No. 4138. Second Appellate District, Division Two.—April 29, 1926.]

H. H. ANDERSON et al., Appellants, v. HARTFORD ACCIDENT AND INDEMNITY COMPANY (a Corporation), Respondent.

[1] Insurance—Highway Robbery—Larceny from Guest on Battleship.—The expression "highway robbery," while not known to the Penal Code of this state, has a recognized or popular meaning, and is not the same as mere robbery; and a policy insuring against "loss from highway robbery by force or violence" will not protect the assured from loss by larceny or sneak theft from the person of the assured while a guest on board of a United States battleship at anchor in a harbor.

[2] Id.—Victim of "Holdup"—Construction of Policy—Intent.—Where a policy insuring against "loss from highway robbery by force or violence" of certain property from the person of the assured, provides that "mere disappearance of property from the person of the assured, unless accompanied by force or violence and unless also within his or her knowledge at the time, is not a risk covered" by the policy, and "it is not intended hereby to cover pocket picking," it is apparent that the parties intended that there should be no recovery under the policy unless the assured was the victim of a "holdup" and thereby lost an article described in the policy.

1. Burglary, larceny, theft, or robbery within policy of insurance, see notes in 41 A. L. R. 846; 44 A. L. R. 844.

[3] ID.—KNOWLEDGE OF LOSS—SUSPECTED ATTEMPT.—The provision of said policy that the assured was not protected unless the loss suffered was "within his or her knowledge at the time," plainly imports a knowledge of loss at the very moment of the robbery which occasioned it; and it could not be said that the assured knew at the time of the robbery that she had been despoiled of her brooch, where she did not see the hand or any suspicious move of anyone, but merely suspected that an attempt had been made to rob her, and she did not know that the brooch had been taken until after she had looked on her dress and on the floor in an endeavor to find it.

(1) 9 C. J., p. 1096, n. 25; 29 C. J., p. 352, n. 88.  (2) 34 Cyc., p. 1799, n. 21.  (3) 9 C. J., p. 1097, n. 26.

APPEAL from a judgment of the Superior Court of Los Angeles County.  J. P. Wood, Judge.  Affirmed.

The facts are stated in the opinion of the court.

Jud R. Rush, William B. Beirne and Alfred F. MacDonald for Appellants.

George L. Greer for Respondent.

WORKS, J.—This is an action to recover under a policy of insurance.  Judgment went for defendant and plaintiffs appeal.

[1]  The policy which respondent issued to appellants insured them, originally, against the direct loss of certain specified property "by burglary, theft or larceny . . . by its felonious abstractions from within" the place of residence of the assured.  Later the protection of the policy was by a rider "extended to cover loss from highway robbery by force or violence" of certain property "from the person of any one insured under this rider while wearing or carrying the same anywhere in the United States or Canada."  The rider also contained this language: "Mere disappearance of property from the person of the assured, unless accompanied by force or violence and unless also within his or her knowledge at the time, is not a risk covered by this rider, and it is not intended hereby to cover pocket picking."

The manner in which the loss occurred out of which this action arose is shown by a stipulation that was entered into at the trial and by the findings of fact which were based upon it. Omitting immaterial or undisputed matters the stipulation and findings recite: "That . . . Claire Anderson . . . was the owner of a diamond bar pin . . . and . . . she was a guest on the battleship Texas, then at anchor in the outer harbor of San Pedro, inside of the breakwater. That at about the hour of two o'clock A. M., Claire Anderson was trying to get to the officers' quarters . . . for the purpose of securing a fur cape, it being checked there while she was attending the 7th anniversary of the ship. This anniversary was attended by perhaps from two to five thousand people. There was a crush as people tried to get to the dressing-rooms and she was forcing or working her way through as fast as possible. She distinctly felt a hand against her chest as it grabbed her bar pin. The hand was there just an instant. She did not see the hand or any suspicious move of anyone but at once looked down to see her pin. It was gone. She looked on the floor and on her dress but it was not there. People were moving past her in both directions and no one made any unusual or suspicious move. . . . The pin was on her dress at the time she felt the hand as described above. The pin and hinge were still upon her dress after the occurrence described. The valuable part, consisting of the filigree and diamond, was snapped or broken off and the dress to which it was fastened was torn for about three-quarters of an inch."

There is no question that the ornament which was thus lost was included in the property which was protected against loss by the policy. There is, also, no question but that appellants must recover under the terms of the rider if at all. Our first concern, then, is to ascertain the meaning of the term "highway robbery," as employed in the rider. Some question may exist as to whether the force exerted in removing the bar pin from Mrs. Anderson's person was of such a nature as to translate the act of purloining it into the crime of robbery. We shall neither discuss nor decide that question. We shall assume as a starting point that the act was robbery. But the rider did not insure against robbery. The protection afforded by it was

against highway robbery. What did the parties contemplate when they employed that expression in their contract? The use of the two words together indicates that the assured were to be protected against something different from mere robbery. In a grammatical sense the word "highway" plainly qualifies the word "robbery." In a legal sense, to what extent does the limitation operate? What is highway robbery?

The expression is not known to the Penal Code of this state, nor, so far as we can discover, has it been made the subject anywhere of legislative or judicial definition which fits the facts here presented. Certainly, it has never been defined by the courts of California. The phrase, however, is in constant use throughout the English-speaking world. We must commence with the view that it was employed by the present parties in the sense in which it is so generally used. What is that sense? There was a time in the British Isles, the early clearing-house of English linguistic development, and even in the most populous portions of them, when the roadside robber haunted every land thoroughfare. The country was badly policed and worse lighted and it was even unsafe to venture at night upon city streets unarmed. In truth, the "quality" seldom fared forth after nightfall, even in densely populated centers, without an armed guard. The highwayman was a creature of the lanes, byways, and roads. Moreover, his activities were so frequent and his exploits so daring that he was the public enemy. Gibbets were maintained at important crossroads, and upon them robbers were summarily hanged. Their corpses were allowed to swing until their bleached skeletons became dismembered under the action of winds and rain, because of the example thus furnished. It is no exaggeration to say that the land was filled with the clanking of chains and the swaying of bodies which were suspended from them. It is impossible now to understand fully the conditions which then prevailed, but they contributed a striking feature to the annals of Great Britain, they furnished a dominant element in the growth of English criminal law, and they have colored with a carmine hue the literature of every English-speaking people. It is proper first to enter the domain of history, for out of that has emerged the influences which have operated under the conditions above

depicted. The terrors of highway robbery menaced the population of England during a long period of time. In a chapter devoted to social conditions between the years 1200 and 1400 Aubrey says: "The travelling was attended with many inconveniences and was often dangerous as well as difficult. Traders could not venture through England with their merchandize, unless attended by a large armed escort. Persons formed themselves into caravans for mutual protection when about to undertake a long journey, or to cross a forest or a heath. The perils were greater to that numerous class who had to travel on foot, and who could not always ensure reaching a place where lodgings might be found. Not only were there dangers from bandits and outlaws, but knights, landed gentry, and noblemen connived at their dependents practising highway robbery; and shared in the plunder." Macaulay, dealing with conditions following the Peace of Ryswick, which was concluded in 1697, sets down the following graphic recital: "The peace had, all over Europe, and nowhere more than in England, turned crowds of old soldiers into marauders. Several aristocratical equipages had been attacked even in Hyde Park. Every newspaper contained stories of travellers stripped, bound, and flung into ditches. One day the Bristol mail was robbed; another day, the Dover coach; then the Norwich wagon. On Hounslow Heath, a company of horsemen, with masks on their faces, waited for the great people who had been to pay their court to the King at Windsor. Lord Ossulston escaped with the loss of two horses. The Duke of Saint Albans, with the help of his servants, beat off the assailants. His brother, the Duke of Northumberland, less strongly guarded, fell into their hands. They succeeded in stopping thirty or forty coaches, and rode off with a great booty in guineas, watches, and jewellery. Nowhere, however, does the peril seem to have been so great as on the Newmarket road. There, indeed, robbery was organized on a scale unparalleled in the kingdom since the days of Robin Hood and Little John. A fraternity of plunderers, thirty in number according to the lowest estimate, squatted, near Waltham Cross, under the shades of Epping Forest, and built themselves huts, from which they sallied forth with sword and pistol to bid passengers stand." In a note to the first sentence of this text, the

great historian says: "George Psalmanazar's account of the state of the south of France at this time is curious. On the high-road near Lyons he frequently passed corpses fastened to posts. 'These,' he says, 'were the bodies of highwaymen, or rather of soldiers, sailors, mariners, and even galley-slaves, disbanded after the peace of Reswick, who, having neither home nor occupation, used to infest the roads in troops, plunder towns and villages, and, when taken, were hanged at the county-town by dozens, or even scores sometimes, after which their bodies were thus exposed along the highway *in terrorem.'*" The "Fortnightly Review" makes this statement as to conditions existing as late as the period 1780–1786: "Even a walk or drive to Kensington or Chelsea, both country villages at that time, was not undertaken without fear of highwaymen or footpads."

When we enter the realm of the law, it is not surprising that the effect of these startling aberrations from a regulated state of society becomes manifest. Under the English law, from an early period, robbery on the king's highway was distinguished from other forms of crime. It was punished capitally and the offender was denied the benefit of clergy (4 Black. Com. 243, 373). Without going to sources, an interesting statement upon the subject of highway robbery, as contemplated by the English law, is found in the arguments of counsel and in the opinion in *State* v. *Johnson*, 61 N. C. 140. In that case the defendant was charged under a statute which prescribed the death penalty for robbery perpetrated in or near a public highway. The evidence showed that the victim of the crime which was sought to be punished in the case was assaulted and robbed while walking along a railroad track. It was said in the course of the brief filed on behalf of the defendant: "Highway robbery *insidiatio viarum* was excluded from clergy at common law previously to Statute 25, Edw. III, *Pro clero;* 4 Bl., 373; 1 Chit. Cr. Law, 675; 2 Hale, 333. The Statute *Pro clero* gave clergy for any treasons or felonies not touching the King himself or his royal majesty. Yet a construction prevailed after this that *insidiatores viarum* might be denied it. Hale & Haw, *ubi supra.* The reason assigned being that it was a sort of hostile act and bordered upon treason. 4 Bl. 373; 1 Ch. Cr. L., 675. Upon complaint of this to Parliament, the Stat. 4, H. IV, chap. 2, granted it

to them. The reason above grew out of the fact that the King had a right of passage for himself and for all of his subjects. Comyn, Chemin (A, 2), page 27. Where highways are unsafe, the whole country is in peril. The policy of this security applies only to places where every citizen has a right to pass and repass at pleasure; particularly to such upon which every man is sometimes compelled to be; and to transport articles of value; and expose such at lonely places; at the same time that the robber himself cannot be excluded from being thereupon, having the right to pass and repass as well as others, and being under the protection of the sovereign in the enjoyment of his right.'' The following appears in the opinion of the court: ''The benefit of clergy is taken from the offense of robbing any person in or near any public highway. Statutes Hen. VIII, and Ed. VI. re-enacted, Rev. Stat., chap. 34, sec. 1, and also re-enacted, Rev. Code, chap. 34, sec. 2, in connection with sec. 22. These statutes, from the earliest time, have received a uniform construction, by which it is held that although, at the date of the passage of the original acts, there were three sorts of public highways—one called '*iter*,' over which the people passed on foot; another called '*actus*,' over which they passed on foot or on horseback; and a third called '*via*,' over which they passed on foot or horseback, or in vehicles with wheels[,] Coke Lit. 56, a. b; and although the statutes use the words 'public highway,' still they do not embrace any but the last kind—the '*via*,' or by way of pre-eminence, the highway. 1 Hale, 535, *Ibid.*, 333; 2 Hawk., 476; 4 Blackstone, 373. For it was considered that the mischief intended to be remedied existed in a special degree in regard to the '*via*,' or highway of most importance; that is, those over which all of the King's subjects, were at liberty to pass and repass on foot, on horseback, and in carriages; and it was resolved by the judges that a statute so highly penal, and affecting human life, should be confined to the most important kind, and could not, by construction, be made to include the two other kinds, notwithstanding the mischief in some degree extended to them.'' Upon this reasoning the court determined that a railway was not a highway within the meaning of the North Carolina statute. This final result is not stated for the purpose of showing that the unknown person who

relieved Mrs. Anderson of her brooch, under the facts in the present case, was not a highway robber, but in pursuit of our endeavor to ascertain the accepted meaning of the term "highway robbery." The import of that expression under the English criminal law is determinable in some degree from an inspection of modern lexicons. A part of the matter under the word "highway" in the Standard Dictionary reads: "In English history, highway designated the main public road, which was the subject of special royal enactments controlling the policing thereof; it was popularly known as the king's highway." It is said in Webster, under the word "highway": "Originally, highway designated a chief or principal way, which, being traveled by the public in general, was, early in English history, brought under the protection of the king's peace."

When we turn to English literature, and especially to those works of fiction which are based on historic fact, what a broad foundation is found upon which has been built a popular understanding of the expression "highway robbery"! The activities of the roadside robber furnish one of the most persistent themes in British story. Who that has read English fiction—and even the pages of history from which the English novelist has taken his facts—has not heard of Dick Turpin, Jack Sheppard, and Robin Hood? Scott's novels are full of the exploits of the highwayman. "Rob Roy" deals with the theme. Dickens has not neglected it, as witness "A Tale of Two Cities." Bulwer is crowded with it, one instance being "The Last of the Barons" R. D. Blackmore's great novel, "Lorna Doone," is practically based upon it. The same strain stands forth prominently in Jeffery Farnol's delightful latter-day novel, "The Broad Highway." One of Lord Dunsany's sketches, printed in the collection which carries the name, "The Sword of Welleran," deals with the same theme. Nearly all of these romantic tales depict graphically the manner in which the highway robber did his work, and several of them paint the picture of his summary punishment upon the gibbets of the roadside—a picture different only in degree from that painted by Psalmanazar in his account of conditions in France following the Peace of Ryswick. And the few tales mentioned are but a minor fraction of the

vast number which load the shelves of English and American libraries.

In our quest it is not amiss to turn to the modern lexicographer. The Encyclopaedic Dictionary disposes of the term "highway robber" thus: "The same as highwayman." Highway robbery is defined in that work as: "Robbery committed on or near the public highway." The definition of "highway robber" as given in the work calls for the accompanying definitional rendition of "highwayman." It is: "One who robs passengers on the public highway; a highway robber." Neither "highway robber" nor "highway robbery" is defined in any of the other dictionaries which lie before us. March's Thesaurus Dictionary thus defines "highwayman": "A robber who plunders on public roads." The Standard Dictionary renders the same word thus: "One who practises, commits or attempts to commit highway robbery; one who robs in public places, or lurks for the purpose of robbery." Webster defines "highwayman": "One who robs on the public road; a highway robber." The Century Dictionary gives this definition of that word: "A robber on the highway; one who robs passengers in public roads or places."

We may now safely state the mental picture formed by the composite citizen—and it is his view that we endeavor to ascertain—when he reads or hears of a highway robber or a highwayman. What does he see? There can be no doubt of the answer. History, literature, tradition, and conversation based upon them have given him a definite conception of the two terms, for, in truth, the two are one. He sees a determined individual, whether masked or unmasked, who appears before the wayfarer with pointed weapon or uplifted bludgeon and rifles the pockets of his victim. He sees no secret plunderer, no sneak thief, no pickpocket. He could see no highway robber, no highwayman, in the individual who despoiled Mrs. Anderson of her treasured bar pin. If we grant that the crime through which she suffered was robbery, under the technical rules of the criminal law, we are convinced that it was not highway robbery within the meaning of the insurance policy before us.

We are not concerned, in reaching this conclusion, with the question whether the waters of San Pedro harbor or the

decks of the battleship "Texas" are a highway in the sense that a highway robbery might have been committed upon them. Such a question would have arisen if Mrs. Anderson's despoiler had made her the victim of a "holdup" in some dark and secluded spot upon the decks of the ship —if he had boldly confronted her, put her in terror, and by such a means had deprived her of her property. Even under such circumstances a respectable brief could have been written in derogation of the right of appellants to recover under the policy. Under the actual circumstances of the case the necessity for such a brief does not exist.

[2] If we admit for the sake of argument, in approaching a new angle of the case, that there is doubt as to the general meaning we have ascribed to the expression "highway robbery," there is yet an objection to the right of appellants to recover. There is enough in the rider attached to the policy to show that the parties intended the term as employed in their contract to have some such meaning as we, in an attempt to ascertain its usual import, have fastened upon it. By the terms of the rider appellants were insured against "highway robbery by force and violence." In the commission of every robbery either force is exerted or violence is committed. These are necessary elements of the crime and they distinguish it from larceny. They are therefore embraced within the meaning of the word "robbery." Here, however, the words "force" and "violence" are expressed accompaniments to the word "robbery." Would it not be a curb upon the intention of the parties to determine that by the addition of the accompanying words they intended merely a reference to the slight degree of force which, under some of the decided cases, will serve to raise the crime of larceny to that of robbery, and which is implied in the latter word itself? Under some of the cases, undoubtedly, and considering now only the crime of robbery and not what the parties here have called highway robbery, the tearing of Mrs. Anderson's dress and the separating of the "valuable part" of the brooch from the pin which held it, would constitute a sufficient force to make the crime a robbery. We think the parties meant much beyond that by the employment of the expression "with force and violence." And there is more in the rider to indicate that they did. We have seen that it contained this negative pro-

vision: "Mere disappearance of property from the person of the assured, unless accompanied by force or violence and unless also within his or her knowledge at the time, is not a risk covered by this rider." In the pursuit of our present purpose this language does not require dissection. To us it seems plain as it stands. When added to the phrase "with force and violence," where that expression is inserted after the words "highway robbery," it appears to us to show that the parties intended the latter term in their contract to have the meaning we have ascribed to it as a result of our search for the sense in which it is generally accepted. The parties intended that there should be no recovery under the rider unless one of the assured was the victim of a "holdup" and thereby lost an article described in the rider.

[3] There is, however, one clause of the rider which requires a more minute consideration. Appellants were not insured unless a loss suffered by one of them was "within his or her knowledge at the time." This language plainly imports a knowledge of loss at the time, that is, at the very moment, of the robbery which occasioned it. The clause has already operated strongly as an aid to our determination that the rider insured appellants only against "holdups." But let us now investigate more narrowly the question whether Mrs. Anderson knew "at the time" of the robbery that she had been despoiled of her brooch. According to the findings of the trial court, based upon the stipulation between the parties: "She distinctly felt a hand against her chest as it grabbed her bar pin. The hand was there just an instant. She did not see the hand or any suspicious move of anyone but at once looked down to see her pin. It was gone. She looked on the floor and on her dress but it was not there." The only part of the finding which tends in any degree to warrant a recovery under the policy is the recital—for it is nothing more—"as it [the hand] grabbed her bar pin." There is here no showing that she was conscious that any hand had "grabbed" the pin and had actually asported it, or, even, that she was conscious that it had been "grabbed" at all. The recital, too, must be considered with the context of the portion of the finding in which it occurs. So considered, the strongest view that can be taken of the finding is that it shows that

Mrs. Anderson *suspected* that an *attempt* had been made to rob her. What is there in the finding to limit it to that potency, granting that it is so strong? The victim of the crime, after she felt the hand on her chest, looked down *to see* her brooch. She looked on the floor and on her dress, *but it was not there.* There is no finding that she knew, until after she endeavored to find the brooch, that her dress had been torn or that the pin had been broken from the valuable part of the ornament. There was plainly an expectation or hope on her part that she would find the ornament either on her person or on the ship's deck. She therefore, we repeat, merely suspected that an attempt had been made to rob her. Surely there was here no "disappearance" of the brooch which was "within . . . her knowledge at the time" when it was taken. This circumstance alone precludes a recovery in this action.

We do not find it necessary here to consider specially the portion of the negative clause of the rider to the effect that the policy was not intended "to cover pocket picking." The authorities upon the question whether the despoiler who filched Mrs. Anderson's brooch was a mere pickpocket are at variance. We do not feel compelled to an attempt to reconcile or to distinguish them.

The negative clause of the rider furnishes an aid to the construction of the policy which we have not yet mentioned. The policy as originally issued appears to have protected the assured against all forms of larceny and robbery occurring within their household. If it be argued from this that the rider should be construed in such a manner as to protect the parties to the same extent when abroad "anywhere in the United States and Canada," the argument falls to the ground upon a mere perusal of the negative clause mentioned. It plainly shows that the protection of the rider was not afforded as to all classes of robbery. It is more than plain from all that we have said that the rider covered no kind of larceny.

Judgment affirmed.

Finlayson, P. J., concurred.

CRAIG, J., Dissenting.—I dissent. The important facts in this action are, that the plaintiff was robbed of a dia-

mond taken from a pin which she was wearing while on board the battleship "Texas," then anchored in the Los Angeles harbor. It was stipulated that she "distinctly felt a person's hand grasp the pin." Recovery is sought upon a contract of insurance; the body of the policy is one insuring against burglary of the assured's dwelling, and a rider attached thereto purports to further protect from "loss from highway robbery by force or violence." The pin was fastened to the waist worn by the assured, and the robber separated the diamond from the clasp, leaving the latter attached to the waist. It was also provided in the rider that "Mere disappearance of property from the person of the assured, unless accompanied by force or violence, and unless also within his or her knowledge at the time, is not a risk covered by this rider."

Upon the theory maintained by the respondent, because of the fact that the robbery was committed on the "Texas," it was not highway robbery, and therefore the loss was not covered by the policy. The taking of the diamond constituted robbery. (Pen. Code, sec. 311; *Rex* v. *Maron,* R. & R. C. C. 419.) Under the stipulation the assured had knowledge of the robbery. The Los Angeles harbor is within the jurisdiction of Los Angeles County. (*Manley* v. *People,* 7 N. Y. 295, 304; *People* v. *Wilson,* 3 Park. Cr. (N. Y.) 199; *Haskins* v. *People,* 16 N. Y. 350.) It is navigable, and hence is a public highway. (*Gunter* v. *Geary,* 1 Cal. 462.) Innumerable other authorities could be cited to the last point, but it is not necessary. The Encyclopaedic Dictionary defines a highway robbery as a robbery committed on or near the public highway. Many other works of the same character announce substantially the following definition of a highway robber: "One who robs in public places." Under these authorities, and in the absence of any statutory definition of the term, it is clear that the loss sustained by the plaintiff was through a highway robbery accomplished by force, and with her knowledge.

In so far as the respondent's single argument is concerned, no further discussion is necessary, but since I am constrained to dissent from the foregoing opinion, the discharge of a full measure of service seems to require that

the reasons inducing that conclusion be set forth in greater detail.

Of course, the intent of the parties constitutes the contract. Our object is to discover that intent. However, they are presumed to have contracted with the law in mind, and to have used words in the meaning which they possess as a matter of law. Hence, it is important here to determine the meaning of the term "highway robbery." While the definition of "highway robbery" in this action involves the determination of civil rights only, it is a term usually found in the realm of criminal law, and we must seek there for light upon its true meaning. (Macgillivray on Insurance [1912], p. 964.)

To my mind, little of value is to be gained by consideration of the occurrences, conditions, and classes of highways described in early English history. In the first place, if it be accepted without challenge that about the year 1200 A. D., and for some centuries thereafter, "highway robbery" was a term which as then used was applicable only to robbery of a type intended to inspire terror in the bravest hearts, and committed on a *via,* as distinguished from an *iter* or *actus* of that period, these facts furnish no aid to a determination of the question here presented, to wit, Did the parties to this insurance contract intend the company to insure against a loss to the assured such as that shown to have been sustained in the instant case? This is so, first, because nothing in the foregoing opinion indicates that waterways did not sometimes form a part of the *vias* or king's highways. Blackstone has well said, "Law is the soul of reason." A law would surely fail miserably to measure up to this standard, which would denounce a certain act as a felony without benefit of clergy if committed on the king's highway built upon land approaching a river, but wholly omit to condemn the same act on a boat crossing the river. History tells us that the king's highway led from London to the Thames, at Staines; there the king and his subjects, who might be desirous of traveling to Worchester, were transported by boats across the river, or might go by bridge; there the *via* on land resumed, and by it they might pass on to their destination. We are informed that one purpose of the law at that time, making robbery a more serious offense when committed on the king's highway

than when perpetrated upon or near the *actus* or *iter*, was that all of the king's subjects were at liberty and were often required to pass and repass upon the former, and hence greater protection should be extended against the taking of articles of value from them there by robbers. Again, robbery on the king's highway was more severely punished, out of respect and consideration for the rights and prerogatives of royalty and nobility, who principally traveled thereon and who usually used the *via* rather than the *iter* or *actus*. The carriages for whose use the *vias* were constructed were the property of nobility and of the few rich among the untitled. The poor had not much of value which might be the subject of plunder. The *vias* were few in number, but the nobility and the rich perforce crossed the Thames, the Trent, and other rivers. They traveled up and down these highways in boats before *vias* were constructed or carriages were built, and navigable waters were recognized as highways, and from the earliest times formed a part of the same system of transportation and travel as did the *vias*. Who will deny the unreasonableness of a law which would ordain one rule and one punishment for robbery done in a *via*, and none, or an entirely different rule and punishment, for the same depredation by the same robbers against the same travelers, on a boat crossing from one shore of the Thames to the other? Every consideration of logic and reason would require the same act to be denounced as the same crime in each instance, and there is absolutely nothing in either the law quoted or the references to history and literature contained in my associates' opinion to justify the conclusion that the law made any distinction in that behalf.

On the other hand, there is substantial reason and authority for the contrary conclusion, to which attention will be called later.

Again, the conditions formerly existing ceased centuries ago, and the reasons which may have resulted in the robbery upon the *via* being denied benefit of clergy, while the same outlaw who worked on the *iter* and the *actus* had that consideration allowed him, never had any application in America. Of royalty and nobility we have none. The poorest citizen has the same protection afforded him as the

richest, and highways far superior to ancient *vias* form a network over our state and nation.

The mere fact that Scott and Blackmore in their inimitable imagery and fiction have painted pictures of highwaymen three-fourths hero and one-fourth outlaw would hardly be taken as proof that such was the character of all highwaymen then. These and other authors visioned ideals not the inferiors, or even the average robbers, of that time; and their tragic descriptions of the deeds of robbery done with dash and daredevil bravery upon the *vias* is no indication that even at that time the taking of property from the person of another by a cowardly thief who snatched a watch, broke the chain which attached it to the clothing of the owner, and ran, would not have been called a robbery then as much as it would to-day, and a highway robbery, also, if it took place on or near a *via,* or on a navigable waterway. But if we were to assume that highway robbery could not have been committed on an *actus* or *iter,* but might upon a *via,* and because of this we further assume the fact to be that highway robbery could not be committed on a water highway (which of course does not follow) there exists a further reason why we are not assisted in construing the insurance policy in question by the facts and fiction of those olden times. It is common knowledge that the meaning of many, if not of most, terms used in the year 1200, or even 1500, A. D., have substantially changed, some being used in a radically different sense, some falling into almost disuse, and others so evolving as to be vastly broader in their scope. Without definite continuity of the ancient distinctions between the various classes of highways, we are left in the position of accepting precedent hundreds of years old, without any indication that the reason for its origin still exists. While a proper respect for precedent is essential to security of property and of rights of every character, I apprehend that instances are rare indeed among the reported cases where a definition established by statute or judicial decree rendered in the shadow of the Dark Ages has been accepted, although the reason upon which it was based is but a memory. Such procedure would furnish justification for the common criticism of courts, usually mistakenly and ignorantly made, that they are hidebound, and listen to the voices of the dead rather than to

those of the living, in a blind adherence to precedent, however old and lacking in logic.

Suppose a suit be brought on a contract in which the term "landlord" is used, and a dispute arises concerning the meaning of that word and the rights of the landlord. Should we go back even as far as Blackstone and base our decision upon his discussion of the subject, we would find ourselves holding that a landlord has jurisdiction over dependent landholders, with power to redress misdemeanors, and nuisances, to settle their disputes, etc. Blackstone's definition of a tenement has no application to that term as used in America to-day. The constant forward march of civilization has resulted in complete abandonment of the early definition of the term "debtor" as a felon. Nothing would be gained in construing modern statutes or contracts by tracing the term "debtor" back to the days of fettered felons, and imprisonment for debt, or in reflecting upon the former use of chains, and execution blocks, and the discovery of pieces of dead debtors, in quest of a modern definition of a market place. Difficult, indeed, would be the task of writing a thesis upon commercial law, or any of its branches, if the slightest recognition were afforded the terms and principles denounced by the Twelve Tables.

So, in this instance I cannot bring myself to take into serious consideration that part of the foregoing opinion which deals with conditions, statutes, and literature of the Middle Ages and early modern era. It is not my contention that these should never be given attention, but that their worth is negligible unless it can be shown that the conditions and causes are the same as those existing to-day.

To my mind it is elementary that every thoroughfare over which all the public have a right to pass and repass and use for transportation and travel is a highway, and that this definition applies to waterways as well as those on land; also that one who robs on or near a highway is a highwayman. This being so, little authority need be cited to support these propositions. However, serious challenge, I think, justifies a more extended reference to authorities.

To secure uniformity in legal rights and law enforcement it is essential that no different consequences should follow the performance of an act in one place in the same sovereignty than in another. There is no apparent reason why

*per se* an act of any character should be classified differently when committed on water than on land, or when it is done on a boat traveling the state highways of navigable waters than on a bus traveling the state highways constructed on the solid earth. The route of travel on which the ship was at the time the act was committed was a state highway, and it was within the sovereign jurisdiction of the state of California as unconditionally as any point in the system of public boulevards in this state. (*United States* v. *Bevans,* 3 Wheat. (U. S.) 336 [4 L. Ed. 404, see, also, Rose's U. S. Notes]; *Commonwealth* v. *Peters,* 53 Mass. (12 Met.) 387.)   In Hargrave's Tracts, at page 8, it is said: "For as the common highway on the land be for the common land passage, so these kind of rivers, whether fresh or salt, that bear boats or barges, are highways by water." The supreme court of Massachusetts, in deciding the case of *Attorney-General* v. *Wood,* 108 Mass. 436 [11 Am. Rep. 380], used the following language: "Navigable streams are highways, and a traveler for pleasure is as fully entitled to protection in using a public way whether on land or on water as a traveler for business." "Where water is navigable in law, whether or not within the ebb and flow of the tide, the public have a common right to use it for navigation as a public highway." (29 Cyc. 304.) In *Gunter* v. *Geary,* 1 Cal. 462, the supreme court of this state said: "It is well settled that all that part of a bay or river below low water at low tide, is a public highway . . . " In many other jurisdictions the same rule exists, and has been applied, in both civil and criminal cases involving obstructions of public highways, and kindred questions. In *American Steamboat Co.* v. *Chace,* 16 Wall. (U. S.) 522 [21 L. Ed. 369], it was said that the waters of Narragansett Bay constituted "one of the public highways within the state" of Rhode Island.   In *State* v. *Narrows Island Club,* 100 N. C. 477 [6 Am. St. Rep. 618, 5 S. E. 411], it was said with reference to Big Narrows, in Currituck Sound: "If the water referred to was thus navigable, the public had the right to use the same for the purposes of a highway and navigation . . . Navigable waters are natural highways—so recognized by government and the people—and hence it seems to be accepted as a part of the common law of this country, arising out of public neces-

sity, convenience, and common consent, that the public have
the right to use rivers, lakes, sounds, and parts of them,
though not strictly public waters, if they be navigable in
fact for the purpose of a highway and navigation em-
ployed in travel, trade, and commerce.'' Other authorities
of the same import are numerous. (*Bigelow* v. *Nickerson,*
70 Fed. 113, 117 [30 L. R. A. 336, 17 C. C. A. 1]; *Robin-
son* v. *Chamberlain,* 34 N. Y. 389 [90 Am. Dec. 713], quoted
with approval in *German Alliance Ins. Co.* v. *Home Water
Supply Co.,* 174 Fed. 764, 768 [42 L. R. A. (N. S.) 1005,
99 C. C. A. 258]; *Commonwealth* v. *Coombs,* 2 Mass. 489,
492; *Moore* v. *Day,* 199 App. Div. 76 [191 N. Y. Supp.
731]; *Smart* v. *Aroostook Lumber Co.,* 103 Me. 37 [14
L. R. A. (N. S.) 1083, 68 Atl. 527]; *Dwinel* v. *Veazie,* 50
Me. 479, 484; *Mashburn* v. *St. Joe Impr. Co.,* 19 Idaho, 30
[33 L. R. A. (N. S.) 824, 113 Pac. 92]; *Chicago, R. I. &
P. R. Co.* v. *Williams,* 148 Fed. 442, 447; *B. & M. R. R. Co.*
v. *Lowell & L. R. Co.,* 124 Mass. 368; *Hutchinson* v. *Watson
Slough Ditch Co.,* 16 Idaho, 484 [133 Am. St. Rep. 125,
101 Pac. 1059]; *State* v. *Portland Gen. Elec. Co.,* 52 Or.
502 [95 Pac. 722, 98 Pac. 160]; 2 Chitty's Criminal
Law, 382.)

A case which illustrates the fact that waterways and land
thoroughfares are not to be distinguished as highways is
*French* v. *Camp,* 18 Me. 433 [36 Am. Dec. 728], involving
the Penobscot River, which had frozen over, and a hole had
been cut in the ice by the defendant for the purpose of
watering stock. The opinion of the court reads, in part:
''The waters of the Penobscot are, of common right, a pub-
lic highway, for the use of all the citizens. This right is
generally exercised when they are in the fluid state; but,
when congealed, the citizens have still a right to traverse
their surface at pleasure.''

Any distinction, therefore, must necessarily be of a tech-
nical character, based only upon the fact that water is
water and land is land. It should not be the purpose of
courts to base their decisions upon such inconsequential
distinctions, nor should it be presumed that the parties to
a contract believed the laws to be so framed, or intended
their contracts to recognize such unessential differences.

In addition to the definition of a highway robber given in
the Encyclopaedic Dictionary, Funk & Wagnall's Interna-

tional Dictionary defines a highwayman as "one who robs in public places." In 29 Cyc., at page 364, it said that " 'Highway' is a name for all kinds of public ways, whether by land or by water," and many cases are there cited to the effect that navigable waters are highways.

It is well established that, when the language used in a contract of insurance is ambiguous, or when a doubt arises in respect to its application, or as to limitations of liability thereunder, it must be interpreted most favorably to the insured. (*Clark* v. *New Amsterdam Casualty Co.*, 180 Cal. 76 [179 Pac. 195]; *Bayley* v. *Employers' etc. Corp.*, 125 Cal. 345 [58 Pac. 7]; *Welch* v. *British American Assur. Co.*, 148 Cal. 223 [113 Am. St. Rep. 223, 7 Ann. Cas. 396, 82 Pac. 964]; *Coniglio* v. *Connecticut F. Ins. Co.*, 180 Cal. 596 [5 A. L. R. 805, 182 Pac. 275]; *Wells-Fargo & Co.* v. *Pacific Ins. Co.*, 44 Cal. 397; *Mah See* v. *North American Acc. Ins. Co.*, 190 Cal. 421 [26 A. L. R. 123, 213 Pac. 42].) I do not think it necessary that this rule be exclusively relied upon in the case at bar to maintain the company's liability, since we deem a navigable harbor a highway to all intents and purposes, nor do I feel impelled to limit insurance against highway robbery to robbery committed on a highway technically established as such for all municipal purposes. It is generally understood, and is said in Webster's New International Dictionary, that a "holdup" is a "highway robber," and I think the appellants contemplated insuring themselves against loss from robbery by force and violence in the open, as distinguished from, or in addition · to, thefts from their domicile.

This suggests another consideration which points to the same conclusion as above indicated, namely, that the parties intended the clause being construed to have a wide scope. This is, the fact that the principal part of the insurance contract constitutes one against the unlawful taking of personal property from within the premises described, and it is followed by the provision in question, intended to afford protection against results from highway robbery. Surely, the insured, as well as the insurer, had in mind not so much the exact spot or route in which the robbery should take place, as the nature of the act to be insured against. It would appear quite certain that they contemplated in-

surance against the taking of personal property from the person by means of force or violence, committed anywhere in the open, not covered by the preceding provisions of the policy, and it can hardly be thought that the parties at the time considered making a distinction between such acts, whether done in a field, or on water, or within the confines of a boulevard. Suppose bandits commit a robbery of a horseman or pedestrian upon one of the bridle paths of the parks, or among the hills of California. Would anyone doubt the propriety of describing the occurrence as a highway robbery, or those who committed it as highwaymen? Yet these bridle paths are substantially the same "ways" as were the *acti* of history. Having contracted for reimbursement for losses occasioned by similar classes of acts than from the home without doubt the idea of the parties was to insure against all other such robberies committed by force and violence, with knowledge of the assured. Viewed from every standpoint, the wording of the contract of insurance points to this conclusion. It is to be noted that the rider did not insure against loss from all highway robbery, but only "loss from highway robbery by force or violence," etc. Clearly, the addition of the words "by force or violence," after "highway robbery," indicates a limitation upon the class of highway robbery, loss from which it is intended to insure. There might be highway robbery where the taking was by putting in fear. This is evidently the purpose which the parties had in mind in adding the words "by force or violence," rather than as indicating that they believed the content of the term "highway robbery" to necessarily involve excessive force or violence.

Again, the further limitation upon the lability of the insurer points inevitably to the correctness of the construction above indicated. The additional words prove, if nothing else does, that the meaning ascribed by the foregoing opinion to the term "highway robbery" could not have been in the minds of the parties to this contract. If they pictured a determined individual, perhaps masked, appearing before a wayfarer, with uplifted bludgeon, or pointed firearm, rifling the pockets of his victim, who surrenders in abject terror, can anyone reasonably suppose that they would have regarded it as necessary to have inserted the stipulation that "mere disappearance of property from the

person of the assured, unless accompanied by force or violence and unless also within his or her knowledge at the time, is not a risk covered by this rider''? Could anyone conceive of the victim of a highway robbery committed in the manner so graphically portrayed in ''Lorna Doone,'' or ''A Tale of Two Cities,'' or ''George Psalmanazar's Account of the State of the South of France,'' not having ''knowledge at the time'' that he was being robbed? The fact that the rider contains this added restriction upon the insurer's liability seems to exclude the idea that the parties contemplated only insurance against the type of tragedy occurring upon some *via* in the days of Robin Hood, and Little John, when such robbers were often regarded as heroes, sometimes occupying a position in the respect and affection of the common people almost on a par with the nobility.

I think that, instead of proof that the parties intended to include in the policy insurance only where the one insured had been a victim of a typical wild-west holdup, this language demonstrates conclusively that the contrary is true, and that they intended to protect against any form of robbery, provided it be committed in the open, and by force or violence, and with knowledge of the victim. If the parties had intended to limit the liability otherwise, it may reasonably be expected that apt language would have been used to express such intent.

It seems clear, also, that the picture of a highway robbery existing in the minds of the parties must have been such that they anticipated a claim might be made that the taking of property from the person even without his knowledge would be included within the term; that it might be said that taking property from the person, though not by force or violence, but only through cunning or artifice, is highway robbery. Otherwise, why should they have added the proviso against such taking being covered by the term? The effect of this language, to my mind, is ·exactly the same as though the contract had read, ''All loss by robbery in the open, if accomplished by force or violence, and if the assured at the time of being robbed has knowledge of the fact, is covered by this policy.'' Under such a statement the appellant would hardly deny liability.

Again, I cannot agree with the narrowly restricted view that the provision "unless also within his or her knowledge at the time" should be so construed as to require that the person robbed must have had a consciousness of the result of the acts of the robber, and an appreciation of the fact that such acts would result in a particular article of value being separated from the person and possession of the assured and falling under the control of the robber. The absurdity of such construction is apparent if we consider where it would, of necessity, lead. Robbers not infrequently operate on crowded streets, and well-traveled roads. Should A, in one of these places, approach B from behind and strike him unconscious with a blackjack, rifle his pockets of money, and strip him of jewelry, under the construction suggested and accepted by the foregoing opinion, no recovery could be had by the insured, because this taking was not within his "knowledge at the time." Or, suppose A, at the point of a pistol, attempts to rob B; B resists, and A uses his pistol for a club, and in a struggle which ensues, B believes he has defended his possession, but upon A desisting and taking flight, investigates, and finds his watch is gone. If the clause in question should be so narrowly construed as to require a consciousness of every move that was made in the combat and its effect in the matter of the extraction of property from the assured, there could be no recovery.

That appellant was forcibly robbed to her then knowledge seems to be conceded, and is clear. Having been robbed on the navigable waters of Los Angeles harbor, used at the time for navigation, it follows that the loss was one suffered through highway robbery within the obvious intention of the contract.

A petition by appellants to have the cause heard, in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 28, 1926.